May it please the Court, my name is Mary Lee, Counsel for Appellant, Wireless Warehouse, Inc. I'd like to reserve five minutes for rebuttal. I'd like to focus on the admissibility of one critical evidence which the District Court relied upon in granting the summary judgment motion. That's Exhibit J, a document called Exhibit J, a three-page document which appears in the Record 709-711. The District Court granted the summary judgment motion mainly relying upon this document. Wireless Warehouse submits to this Court that the document is inadmissible hearsay, and without that document, the motion could not have been granted. Inadmissible hearsay cannot be considered for summary judgment motion. To qualify as a business record under Rule 803-6 of the Federal Rules of Evidence, the document at issue must satisfy certain elements. One of the elements is that it must be based upon the personal knowledge of the entrant or on the personal knowledge of an informant having a business duty to transmit the information to the entrant. Such document also must be properly authenticated. However, in this case, during the discovery, the information Wireless Warehouse obtained regarding this critical document from Appellee Booth to Mobile. Which Exhibit J? Is that the one you're talking about? Exhibit J. That was the regard. There were several amendments. There was another. There was another amendment. So which does J encompass? J is attached to Declaration of Airing and Dispensing. What is it? What does it say? It's an amendment. It's expanding the scope of the original prepaid agreement, Your Honor, incorporating unlimited booths to service and other related products. So it basically expands the scope of the original agreement. That's Exhibit J. And that's the document I'm talking about. Why do you object to this document being considered by the Court? It is because that changed the Court's initial position, which we agree, regarding the subject matter of this litigation. At the beginning, the Court agreed with the appellant in that it determined that the subject matter of this litigation, the causes of actions, were outside the scope of the prepaid agreement or whether or not there are other issues or not. So that was the district court's original decision. But at the summary judgment motion hearing, Booz Mobile presented another document as the basis for expansion of the scope of the original agreement to that critical document, which is unsigned, three-page document. We had enough grounds to challenge the authenticity and also admissibility of the document. If this document, if we were to agree with you and this document should not have been considered, why, how would that alter the result in this case? The conclusion should be altered because without that document, service related to Unlimited by Booz, the new product and new service and establishment of payment centers all over the country, those items are not included in the original agreement, Your Honor. Okay. So let me understand. So part of your argument is that your client relied on this additional service or not? My client, the company, relied upon some promise related to the long-term relationship and devoted itself to expansion of the new product market, Unlimited by Booz, establishing payment centers in various places. This document integrated a new product line into that. That's correct, Your Honor. So why isn't that? So you're not contending you relied on that? We contend that that document did not exist at the time when the oral promise was made to my client and also during the time when my client was working hard to expand the market of Booz. So your argument is that you were expanding the market as a result of the promise  That's correct, Your Honor. And then this document that was introduced purported to say you were expanding the market in accordance with this document as opposed to in accordance with the promise that was made. That's correct, Your Honor. Thank you. Regarding the document, this is what Booz Mobile's person most knowledgeable testified. A question. Do you know who in fact typed up this document marked as Exhibit 28? Exhibit 28 is the same document as Exhibit J, Your Honor. Answer specifically who? Question, yes. Answer, no. Question. Do you know when this specific document was typed by anybody? Answer, no. Question. Did you ever talk to anybody to make an inquiry about who in fact typed up this document marked as Exhibit 28 within the Booz before you came to this deposition? Answer, I did discuss the possibility of who could have typed this up. At the end, question. As of today at this deposition, you do not know who in fact typed up this document and when, correct? Answer, well, as I stated, I don't know who typed up yet. That was the answer. But, counsel, does it matter who actually typed the document? No, Your Honor. If anybody who has personal knowledge about that specific document, who created when and where they obtained the document before they presented to the court, that type of information, if somebody who has personal knowledge about all these things prepared sufficient, I mean prepared good declaration as to that information, then we would have not objected to the document even if we believe that that's false. Do you think this document was fabricated? In fact, Your Honor, I apologize to the court that we should actually contend that that document was created after the fact, not during this litigation. Probably year 2008, after all these things happened. That's our contention. But we do not have proof. But we were investigating about that matter, and that's why we wanted to conduct further discovery, and also that's why I raised that issue at the time of the summary judgment motion hearing, and that's what happened, Your Honor. Because its own declaration, Booth's own declaration, raises enough concern about the authenticity of the document, because regarding the authenticity of the document and to establish business record exception, Anderson, who initially submitted a declaration to establish the validity of the original agreement, not the amendment, 10 months prior to the time was out of the company at the time when Anderson submitted another declaration to submit this document amendment for its admission. Counsel, may I ask you if someone came from the company and testified that the document was in the files of the company and they would certify that they retrieved it from the place where records of this type are normally kept. Would that satisfy your concerns about authenticity? If all other circumstances indicate that there's no issue as to the trustworthiness of the document. However, we presented circumstantial evidence showing untrustworthiness of the document, which we discovered during the discovery process. Now, you brought all of this to the attention of the district court? I'm still not quite sure where this all leads. I'm sorry, Your Honor. So let's assume for a moment, as Judge Rawlinson asked you at the outset, what difference does it make? In other words, if we conclude that the district court erred, what is the end result of that? Without this document, summary judgment motion must have been denied. Why? Because the issue of whether our claims were within the scope of the agreement was a factual issue, factual issue at the time, because it's not a matter of law because there are many disputed factual issues surrounding them. But your argument is that it was not part of the agreement, correct? Correct. All right. So let's assume that that was the issue presented to the district court, right? Yes. Now, do you dispute that the district court misapplied the law? That is, should have applied, erred in applying, I guess it was Virginia law? Is that what it was, Virginia law? Yes. Without this document, district court would not have applied Virginia law because the matters appellant was claiming in the district court were not covered by that specific amendment. Well, let me ask you this. You would agree that you were bound by the new document that you signed, that the party signed, correct? Actually, no, Your Honor. So there was no agreement then in effect? With respect to that aspect, there was no written agreement. Was there any agreement in effect? Oh, there was an agreement. But that is the original prepaid product agreement, that covers just the purchase and payment terms of various cell phone products, equipment and phones. So establishing new payment centers for Unlimited by Boost, the new product, was not mentioned at all in the product. And also, Boost was not a party to the original agreement at all. It's a split. So I think it was, didn't the choice of law provision talk about any, that Virginia law would govern any claims arising out of this? Only arising out of the agreement, which means that terms and interpretation, not just, you know, it's very specific term. So we already dealt with that specific issue at the time when the district court was hearing motion to compel arbitration. The Court originally determined that that specific language is very narrow. Therefore, the claims outside the scope, I mean, it's just broad matters, cannot be covered by the specific agreement, which means that choice of law. I thought the terminology relating to choice of law versus the arbitration agreement was different. The narrow, the arbitration language was much more narrower than the choice of law provision. Our position is that, Your Honor, actually, Boost did not have standing to raise that choice of law provision at that time because it was not a party, Your Honor. You alleged that they were a party to the contract in your complaint, and they answered that they were a party. Actually, I was mistaken as to that part. Later, I discovered that Boost was not a party to the contract. Weren't they a third-party beneficiary to the contract? That was never raised during the litigation. So if they are or aren't they? It could be, Your Honor, but I'm not ready to answer that specific question. But I'd like to save some time. Thank you. Thank you, Your Honor. This is a dispute between a... I just got your name. I'm sorry. Brooks Gresham from McGuire Woods on behalf of Defendant and Pele, Boost Mobile, LLC. Thank you. Where did you say your name was? Brooks Gresham. It says Alan Brooks Gresham. I go by Brooks, which is my middle name... Oh, okay. ...and my dad is a lawyer as well. All right. You have to distinguish yourself. Exactly. I still get his mail. In any event, what we're talking about here is a contract between two business entities that are talking about millions of dollars between them. The actions here were started by an arbitration proceeding, which was instituted by Boost Mobile in Georgia against a wireless warehouse because it had owed about $700,000 in product that it had purchased and not paid for. The response to that was this lawsuit. It was a filing in California alleging an oral agreement to cover a different product line that was not covered under the original contract, which is called the PPA. And that's the subject matter of Attachment J, the amended Attachment J, which came down March 21, 2007. So just so I understand what's going on here, the original contract that was the subject of arbitration was for the payment centers, right? The... No, the entire relationship was governed by the PPA. That was the agreement by which wireless warehouse became authorized to use Boost Mobile's trademarks and distribute Boost Mobile's products by receiving Boost Mobile products through various distributors that are identified as the suppliers in the contract. Did that agreement have Virginia law in it? Yes, it did. The PPA is not disputed that that is the agreement that the parties signed. It's alleged by the plaintiffs. It's attached by the defendant. It has Mr. Kim's signature on it, the president of wireless warehouse. They suggest that Boost is not a party to that contract? Yes, and Boost, it is somewhat oddly phrased in the sense that it's an agreement to distribute Boost LLC's products. Boost is defined as an agent for limited purposes of the suppliers. And so the supplying entities are described as the parties to the contract, though clearly Boost is a... Who signed it? Who signed the contract? A gentleman named Michael Lanzon, who also is a Boost representative, who was one of the people who plaintiff claims made the oral promise to him on behalf of Boost. So now, if this contract covered the relationship, why was the amendment needed? The amendment was needed because in 2007, it was signed, the whole contract was signed in about March of 2007. There was about the same time a new product line coming out, which used a different kind of technology. The Boost Mobile technology is called IDEN, which is a proprietary Motorola technology. The new technology is CDMA, which flows from the Sprint-Nextel merger, and CDMA was the technology that Sprint used. And so the Boost Mobile company was going to introduce this new product line, and it was going to have new pricing terms to cover the way that the replenishment program, the buy, you know, pay your cards, buy them online, the way that program worked and how agents and distributors were compensated for those cards as they came in. So it was a pricing amendment to cover a new product line that was going to be distributed by Boost Mobile. So why wasn't that amendment included with the original contract as one package when it was presented to the court? The product line wasn't available at the time. It was a subsequent product line that came out after that particular distributor agreement was signed. Now, did Boost or Sprint have the right to just send out an attachment and alter the agreement without the other parties signing the document? Yes, Your Honor. Under the PPA, there is a provision in the PPA which gives Boost Mobile the right to do that. It is at, I'll give you the transcript site. I'm sorry, the excerpt site. Why is the PPA in front of you? I apologize for the delay. It's at page 71 of the excerpts. It's paragraph 26 of the PPA, and it says supplier amendments. It says certain provisions of this agreement may be amended unilaterally by supplier. For example, product price increases or changes in the distributor program under attachment C. Distributor agrees that such amendments have the same full force and effect as the original terms of this agreement, even if not executed by distributor with a formal amendment. And there's no contention in this case that that is unenforceable or unconscionable or somehow can't be enforced against wireless warehousing. So counsel, opposing counsel was referencing the district court's original inclination to say that the issues that were at bar were not covered by the contract, and so then this amendment can't. So could you explain that whole process? Your Honor's questioning was directly on point. The standard under the arbitration clause was a different test that the district court applied. The standard under the arbitration clause was arising under the agreement. And that is a narrow arbitration clause, and that's what the judge found, is that the claims of an oral contract for a different product line did not arise directly under the agreement. They arose from a different agreement, an oral agreement, an alleged oral agreement. He expressed no opinion on whether that was the case or not, but he said this arbitration clause is narrow enough that I find that those claims don't fit, can't be arbitrated. That the standard is different under the choice of law provision, which was not applied in the first test. The choice of law provision is governed by the Ned Lloyd case, and that one says that where a choice of law provision says governed by, then governed by means not only arising under, but relating to and arising as a result of the relationship which is set forth in the contract. And so any disputes, including unfair competition and tort claims that may be raised by one side of the contracting parties, those are going to be controlled by the choice of law provision. So is that why you needed the amendment, the attachment J, to show that the claims were covered? Why did Booth think that it was imperative to get this attachment J or exhibit J before the court? Attachment J, well, it wasn't imperative in the sense that attachment J didn't control the application of Virginia law, but attachment J did show that the plaintiff's reliance on an oral promise that flows from a contract was not reasonable, because there is this document out there that not only directly controls the product line, which is supposedly the subject of the oral agreement, but is relatively contemporaneous and was sent by FedEx and indisputably received by someone at the wireless warehouse facility, by someone with authority, according to Mr. Kim. Why would opposing counsel think that exhibit was not genuine? That was not produced when Ms. Anderson went to look for a copy of the agreement. There's an attachment J, which was the original attachment J, which covered the existing product line at the time the contract was first signed. That was produced, and she verified that that was the correct copy of the contract. Subsequently in discovery, when plaintiff asked us to go back and produce all documents relating to, and all that kind of stuff, we went back and found the subsequent attachment J, which covered that direct product line, and produced it before the deposition of our 30B-6. 30B-6 witness was asked about it. He said, yes, that's attachment J. I recognize it. Why do you know? Because I know what our attachments look like. Then he was asked that line of questioning, did you know who typed it? He said, I don't know who typed it. I think it may have been Jennifer Bickle, but I'm not sure. It was a very narrow line of questioning as to his lack of knowledge about that document. What he said before that was, yes, that's attachment J. I recognize it. So what difference does this all make in the end? Ultimately, Your Honor, the dispute over attachment J is a red herring, because that was not necessary to the Court's decision as to whether to apply Virginia law. And Virginia law comes from the application of the PPA, which was not in dispute. Plaintiff alleged it. It does come into the Court's decision when it ruled that the oral promise was inconsistent with the PPA and the CDMA. It could. It was one factor in the Court's analysis. But to the extent that was an error, that was harmless error, because the cases say that where you have a lengthy contract which says, hey, we're not going to modify this contract without some kind of writing, it is not reasonable as a matter of law to rely on an oral promise, even subsequent to that contract, because you know that the parties have said, we're not going to do things orally. That is not reasonable reliance, regardless of whether or not attachment J exists or covered the new product line. Is that what Virginia law says? That's what Virginia law says, as well as California law. The standard is the same on unreasonable reliance. What was the other claim that was recognized under Virginia law? The – well, there were claims that were not. Promissory stop was not recognized under Virginia law.  But there was one other claim that was recognized. Well, there was false promise and there was interference with economic advantage. And that requires an independently wrongful act, not simply non-renewal of a contract or something which is not independently at work. And that's true in California, too. Yes, it is, Your Honor. So what you excluded by applying Virginia law is the 17-200. Correct. The 17-200 claim can't survive if you apply Virginia law. And even if you applied the Virginia unfair competition statute, that only speaks to palming off another's products. And so that plainly is not at issue here. So was the CDMA properly authenticated? It was, Your Honor. It was authenticated by Aaron Anderson, who had previously submitted a declaration saying this is my job title, I have control and custody of these documents, I've looked through this, here's a true and correct copy of the PPA. And then in the subsequent declarations he said here is a true and correct copy of the e-mail attaching the attachment J. And, you know, it's a true and correct copy from our books and records. Was he unaware of the existence of attachment J initially? She was. I don't know what her state of mind was. All I know is that she didn't produce it when she verified the original contract. It may be because she wasn't asked to. She may have just said find the contract. Somebody may have said find the contract and produce it so we can authenticate it. And she did. And then later when we searched the files for all these discovery responses that we were obligated to give, that's when we found the amendment. That's not a very good person most knowledgeable if they don't know about the attachments. She wasn't the person most knowledgeable at the time she was asked to do the declaration on the motion to compel arbitration. It was the first filing in the case and somebody probably just said get me the contract and authenticate the contract. And she said here it is. So she subsequently left Boost and we tracked her down and found her and she did the supplemental declaration saying yes, that's right, this is a true and true copy of Attachment J, even though she no longer worked for us. Any questions from Your Honors? No. I think not. Thank you. Thank you. Ms. Lee. Just a few things, Your Honor. Actually, Boost had access to better evidence, better persons who can authenticate the document if the document in fact existed at the time when all these matters happened. Because Boost wanted to take deposition of Mike Lanson, who actually signed the original agreement, and Boost canceled his deposition right after Job Tucker's deposition. And Boost never asked any question about that specific document during the discovery. I wasn't aware of the importance of the document at the time of Job Tucker's deposition. I didn't bring it up. But even Boost did not ask any question to Job Tucker about the authenticity of the document and the scope of the agreement. That's the first point, Your Honor, regarding the reasonableness of the reliance, regarding the long-term relationship. In fact, Wireless Warehouse presented two compelling evidence showing that Wireless Warehouse's reliance upon the oral promise was justifiable and reasonable. And, in fact, that type of relationship actually existed outside the scope of the agreement. That's the existence of VIP Wireless, another master dealer who was invited to the company owned by Jack Houston. And Roger Schlegel, Boost's former employee, testified that, in fact, VIP Wireless enjoyed that long-term relationship regardless of the one-year term PPA. So you can rely on the relationship between Boost and VIP to justify your claim here. The expected, what type of relationship Wireless Warehouse was expecting from the oral agreement, because that's something that happened in that industry, Your Honor, because Wireless Warehouse, in fact, maintained a long-term relationship with T-Mobile regardless of the two-year contract by renewing it every two years. And those contracts were presented. They are the exhibits attached to Hurricane Deposition Volume 2, Your Honor. And our position is that it was not district court's job to weigh the evidence. We wanted to have just one day to present our case to the jury. So we'd like to ask that the court reverse the summary judgment, remand the case to the district court so that we can present our case to the jury. We are not saying that we should prevail with the evidence we presented to the district court at the present time. Thank you. Thank you very much, counsel. Wireless Warehouse v. Boost Mobile is submitted.
judges: Wardlaw, Paez, Rawlinson